# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BENJAMIN W. COX,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00013 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

### *I. Background and Standard of Review*

Plaintiff, Benjamin W. Cox, ("Cox"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cox protectively filed applications for DIB and SSI on July 2, 2012, alleging disability as of April 27, 2012, due to hypothyroidism; diabetes; depression; social anxiety; obesity; swelling in the legs; right leg sciatic nerve problems; low back pain; osteoarthritis in the back; arthritis in the neck and hands; liver problems; shortness of breath; and fatigue. (Record, ("R."), at 232-39, 253, 265, 311.) The claims were denied initially and on reconsideration. (R. at 136-38, 143-45, 149-51, 158-60, 162-64.) Cox requested a hearing before an administrative law judge, ("ALJ"). (R. at 166-67.) A hearing was held on September 4, 2014, at which Cox was represented by counsel. (R. at 34-74.)

The ALJ issued an unfavorable decision on November 26, 2014. (R. at 17-26, 1768-77.) After the ALJ issued her decision, Cox pursued his administrative appeals, (R. at 8-13, 1899-1904), but the Appeals Council denied his request for review. (R. at 1-6, 1786-91.) Cox then filed an action in this court seeking review of the ALJ's unfavorable decision. *See Cox v. Berryhill*, Case No. 2:16cv00013. By order dated September 20, 2017, this court remanded Cox's claims to the ALJ for further review.[2] (R. at 1794-1828.)

---

[2] More specifically, this court found that substantial evidence did not exist to support the ALJ's finding that Cox's condition did not meet or equal § 6.02(C)(2) of the Listing of Impairments. (R. at 1824-26.) Listing § 6.02(C)(2) was in effect from December 18, 2007, through December 8, 2014. *See* https://secure.ssa.gov/poms.nsf/lnx/0434126009 (last visited Sept. 29, 2021).

By order dated February 16, 2018, the Appeals Council remanded Cox's claims and instructed the ALJ to give further consideration consistent with this court's order. (R. at 1830-31.) The Appeals Council noted Cox filed subsequent claims for disability benefits on July 6, 2016,[3] and rendered them duplicative. (R. at 1830, 2006-11.) Therefore, the ALJ was instructed to consolidate Cox's claims, associate the evidence and issue a new decision on the consolidated claims. (R. at 1830.) Upon remand, the ALJ held a supplemental hearing on August 2, 2018, at which Cox, again, was represented by counsel. (R. at 1728-65.)

By decision dated November 13, 2018, the ALJ again denied Cox's claims. (R. at 1689-1715.) The ALJ found Cox met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2017. (R. at 1691.) The ALJ found Cox had not engaged in substantial gainful activity since April 27, 2012, the alleged onset date. (R. at 1692.) The ALJ determined Cox had severe impairments, namely insulin dependent diabetes mellitus; peripheral neuropathy; inflammatory arthritis/osteoarthritis; degenerative disc disease of the lumbar spine; carpal tunnel syndrome/cubital tunnel syndrome; obstructive sleep apnea; depression; anxiety; personality disorder; macular edema/diabetic retinopathy; obesity; and chronic renal disease, but she found Cox did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1692.)

---

[3] On his July 6, 2016, claims, Cox alleged disability based on uncontrolled diabetes mellitus; heart conditions; eye problems; social anxiety; depression; obesity; and neuropathy. (R. at 2025.)

The ALJ found Cox had the residual functional capacity to perform simple, repetitive, unskilled sedentary[4] work, except he could lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; he could stand up to four hours, walk up to two hours and sit up to six hours in an eight-hour workday; he could stand up to one hour at a time and walk up to 30 minutes at a time, with his need for breaks being accommodated during normal breaks and lunch provided by the employer; he could occasionally push and pull with the bilateral upper and lower extremities; he could occasionally utilize foot controls, climb ramps and stairs, balance, kneel, stoop and crouch, but never crawl; he could frequently handle, feel, finger and use hand controls; and he must avoid exposure to extreme temperatures, excess humidity, excessive vibration, hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds and moving mechanical parts. (R. at 1696-97.)

The ALJ further found Cox was able to attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek; he could have occasional interaction with the general public, co-workers and supervisors; he could respond appropriately to supervision, co-workers and usual work situations; he could not work a job that required driving; and he would require breaks from looking at a computer screen after 15 to 30 minutes. (R. at 1697.) The ALJ found Cox was unable to perform any of his past relevant work. (R. at 1713.) Based on Cox's age, education, work history and residual functional capacity and the

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2020).

testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Cox could perform, including the jobs of an assembler, a packer/stuffer and an inspector/tester/sorter/gauger. (R. at 1714-15.) Thus, the ALJ concluded Cox was not under a disability as defined by the Act from April 27, 2012, through the date of the decision, and he was not eligible for SSI and DIB benefits. (R. at 1715.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued her decision, Cox pursued his administrative appeals, (R. at 1995-98), but the Appeals Council denied his request for review. (R. at 1679-84.) Cox then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Cox's motion for summary judgment filed December 21, 2020, and the Commissioner's motion for summary judgment filed January 20, 2021.

## II. Facts[5]

Cox was born in 1974, (R. at 1732), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a college education and past relevant work as a customer service representative, an information technology specialist and a retail sales associate. (R. at 1732-33, 1759-60.) At his 2018 hearing, Cox testified he was able to take care of his personal needs, such as bathing and dressing himself, without assistance, but he would drop things due to the neuropathy in his hands. (R. at 1734.) Cox stated he spent his day sitting in a

---

[5] The relevant time period for deciding Cox's claims is from April 27, 2012, the alleged onset date, to the date of the ALJ's decision. To the extent that medical records outside the scope of the relevant time period are included herein, it is for clarity of the record.

recliner or lying down watching television and spending time on his tablet listening to music and browsing the internet. (R. at 1739.) Cox stated he could look at a computer screen for up to only 30 minutes at a time due to diabetic retinopathy. (R. at 1742, 1744.) He stated his medication for depression helped "some." (R. at 1747.) Cox stated his mental health caused stress on his relationships with his family, as he would have "explosive outbursts" when he was having a bad day. (R. at 1748.)

Dr. David E. Owens, M.D., a medical expert, testified at Cox's 2018 hearing. (R. at 1749-57.) Dr. Owens testified Cox's impairments[6] did not medically meet or equal the requirements of a listing, including his renal disease. (R. at 1753, 1755.) However, he stated Cox's impairments limited him to lifting and carrying items weighing up to 20 pounds occasionally and 10 pounds frequently; he could sit for a total of six hours in an eight-hour workday; he could stand a total of four hours in an eight-hour workday; and he could walk about two hours in an eight-hour workday. (R. at 1753.) Dr. Owens further stated, as a result of Cox's limited ability to stand and walk, he "might" require brief breaks from standing every hour for "maybe" five minutes and a break from walking "maybe every 30 minutes for maybe five minutes." (R. at 1753-54.) In addition, Dr. Owens stated Cox could occasionally climb ramps and stairs, bend, stoop, crouch and crawl and never climb ladders, ropes or scaffolds or balance; he could frequently use hand controls, bilaterally, both fine and gross motor functioning; he could

---

[6] Owens identified Cox's physical impairments as diabetes mellitus, type I, with poor control; a hemoglobin A1C consistently greater than eight; chronic kidney disease, stage one; proteinuria, but essentially normal kidney function; neuropathy; abnormal monofilament test of the feet; retinopathy, secondary to diabetes; diabetic proliferative retinopathy; cataract of the left eye; a fatty liver with results of a liver biopsy showing mild steatohepatitis with minimal fibrosis; hypertension, controlled "fairly good;" hypothyroidism; obstructive sleep apnea; obesity; chronic low back pain; carpal tunnel syndrome; bilateral cubital tunnel syndrome, with good results from surgery; anxiety; and depression. (R. at 1751-53.)

occasionally utilize foot controls; and he should avoid working at unprotected heights, around moving mechanical parts, temperature extremes, wetness and humidity and excessive vibrations. (R. at 1754.) He stated Cox's kidney problems would have very little, if any real symptoms, and he did not believe Cox's symptoms would be disabling. (R. at 1755.) Dr. Owens stated there was no consistency concerning Cox's mental diagnosis or in his mental residual functional capacity, and he did not believe Cox met or equaled any of the listings for psychiatric impairments; however, based on these impairments, he found that Cox should not have a lot of interaction with a lot of people. (R. at 1755-56.) Dr. Owens stated Cox's visual problems would not significantly interfere with his work-related abilities. (R. at 1757.)

John Newman, a vocational expert, was present and testified at Cox's 2018 hearing. (R. at 1758-63.) Newman was asked to consider a hypothetical individual of Cox's age, education and work history, who could lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; who could stand up to four hours, walk up to two hours and sit up to six hours in an eight-hour workday; who could stand up to one hour at a time and walk up to 30 minutes at a time, with his need for breaks being accommodated during normal breaks and lunch provided by the employer; who could occasionally push and pull with the bilateral upper and lower extremities; who could occasionally utilize foot controls, climb ramps and stairs, balance, kneel, stoop and crouch, but never crawl; who could frequently handle, feel, finger and use hand controls; and who must avoid exposure to extreme temperatures, excess humidity, excessive vibration, hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds and moving mechanical parts. (R. at 1760-61.) In addition, the hypothetical individual could understand, remember and carry out simple instructions in repetitive, unskilled

work; he could attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek; he could have occasional interaction with the general public, co-workers and supervisors and could respond appropriately to supervision, co-workers and usual work situations; he would require breaks from viewing a computer screen after 15 to 30 minutes; and who would require a job that did not require driving. (R. at 1761.) He stated such an individual could not perform Cox's past work, but other work existed in significant numbers that such an individual could perform, including jobs as a final assembler, a stuffer and a gauger. (R. at 1761-62.)

In rendering her decision, the ALJ reviewed records from Dr. Richard Surrusco, M.D., a state agency physician; Dr. R.S. Kadian, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Andrew Bockner, M.D., a state agency physician; Clinch Valley River Health Services; Lonesome Pine Hospital; Holston Medical Group; Anne B. Jacobe, L.C.S.W.; Solutions Counseling; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; The Regional Eye Center; Paula Meade, F.N.P.; Karen Odle, L.P.C.; Mary Beth Bentley, F.N.P.; The Health Wagon; Dr. Bert Spetzler, M.D., a state agency physician; Dr. Jameson Buston, M.D., a state agency physician; Johnston Memorial Hospital; Mountain States Medical Group – Gastroenterology; Johnston Memorial Diabetes and Endocrinology Center; and Community Physicians – Norton.

Cox's records indicate he had been treated for diabetes mellitus, type I, since he was nine years old, and he had used an insulin pump since 2000. (R. at 696, 698, 1258, 1733, 1751.) Prior to the relevant period, in February 2010, an MRI of

Cox's lumbar spine showed T11 and T12 compressions and degenerative changes. (R. at 500.) In December 2010, an MRI of Cox's lumbar spine showed mild lumbar spondylosis without significant interval change and obesity. (R. at 496.) An ultrasound of the abdomen, also performed in December 2010, showed echogenic liver, consistent with steatosis.[7] (R. at 1188.) In 2011, Cox underwent bilateral carpal tunnel release and bilateral cubital tunnel release surgery. (R. at 518, 539.) In August 2011, a CT of Cox's abdomen showed age advanced pancreatic atrophy. (R. at 479.) In September 2011, based on Cox's complaints of headaches, a CT scan of his head strongly suggested chronic bilateral mastoiditis and chronic otitis media, but, otherwise, was unremarkable. (R. at 477.) In October 2011, a CT guided liver biopsy revealed findings consistent with hepatic steatohepatitis/fatty liver disease. (R. at 936-38.)

Cox was seen at Holston Medical Group from January 3, 2012, to April 20, 2012, for treatment of diabetes, hypothyroidism, hypertension and hyperlipidemia. During this time, Cox complained of stress, headaches, right hip pain and back pain, and he denied symptoms of peripheral neuropathy, gastrointestinal complaints and numbness and tingling in the legs. (R. at 753, 827-28, 881, 883, 886, 893.) Examinations showed some mild edema of the lower extremities, but Cox consistently had a normal gait and normal strength and muscle tone in the extremities, as well as normal foot examination, and he was alert and oriented with a normal mood and affect, as well as intact insight and judgment. (R. at 754, 819, 830, 870, 882, 886-87, 894.) Cox was obese, with his weight ranging from 298 to 307 pounds. (R. at 753, 819, 830, 869, 886, 893.) Cox reported more than once that he was not taking his medications as directed. (R. at 828, 883.) He reported he was doing well with continuous positive airway pressure, ("CPAP"), treatment. (R. at

---

[7] Steatosis refers to fatty degeneration. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1579 (27th ed. 1988).

866, 893.) On March 8, 2012, Cox received injections for lower back pain. (R. at 887-88.) X-rays of the hips were mostly unremarkable, and x-rays of the lumbar spine showed only mild spondylosis, mild compression deformity at the T12 vertebra, minimal discogenic abnormalities at the L3-L4 and T12-L1 levels of the spine and mild anterior wedging of the T11 vertebra. (R. at 889, 891.)

On January 3, 2012, Dr. Michael Nannenga, M.D., a physician with Holston Medical Group, noted Cox had diabetic nephropathy, but on March 22, 2012, hepatic function testing was normal. (R. at 755, 828.) In 2012, Cox was diagnosed with diabetic nephropathy, hypertension, hyperlipidemia, hypothyroidism, elevated liver enzymes, nonalcoholic steatohepatitis, microalbuminuria, uncontrolled type I diabetes, neuropathy, neck pain, migraine headaches, hip pain, sciatica and lower back pain. (R. at 754, 820, 831, 887.) Cox was continued on medications and advised to exercise and lose weight. (R. at 754, 821-22, 831-32, 870.) On April 20, 2012, Cox reported he would be looking for a new job because his employer would not accommodate his limitations due to diabetes and severe sleep apnea. (R. at 866.)

On December 6, 2012, Dr. Richard Surrusco, M.D., a state agency physician, completed a medical assessment, finding Cox could perform light[8] work with a limited ability to frequently push/pull with the upper extremities and to handle objects with both hands.[9] (R. at 87-89.) He found Cox could occasionally

---

[8] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

[9] On June 14, 2013, Dr. R.S. Kadian, M.D., a state agency physician, completed a medical assessment which mirrored that of Dr. Surrusco from December 6, 2012, except he found Cox had no environmental limitations, and he noted no limitations on Cox's ability to handle objects. (R. at 112-13.)

climb ladders, ropes or scaffolds, but could perform all other postural activities frequently. (R. at 87-88.) He indicated no visual or communicative limitations, but found Cox must avoid concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 88-89.)

From late 2012, throughout 2013, Cox was seen by various healthcare providers at The Health Wagon. During this time, examinations showed Cox was pleasant, cooperative and in no acute distress; he exhibited some elbow tenderness and right hip tenderness with painful range of motion of the hip; he had no clubbing, cyanosis or edema of the extremities; his peripheral pulses were within normal limits; his cranial nerves were grossly intact; he had good insight and judgment; and he was alert and oriented with good eye contact and clear speech. (R. at 1515, 1520, 1522, 1525-26, 1534, 1541, 1544.) Although Cox reported arthritic pain in his upper extremity joints, he noted that he responded well to Mobic. (R. at 1544.) Cox was diagnosed with benign essential hypertension; diabetes, without mention of complication and not stated as uncontrolled; generalized osteoarthritis; acute sinusitis; unspecified essential hypertension; chronic nonalcoholic liver disease; hypothyroidism; acquired trigger finger; unspecified tachycardia; unspecified hematuria; and proteinuria. (R. at 1515, 1522, 1526, 1535, 1542, 1544.) Cox was continued on medications and advised to start a diet and exercise regimen. (R. at 1516, 1523, 1526-27, 1535.)

From October 2013 to September 2016, Cox was treated at The Regional Eye Center and was diagnosed with bilateral proliferative diabetic retinopathy; bilateral vitreous hemorrhage; bilateral nuclear sclerosis; bilateral diabetic macular edema; and bilateral nuclear sclerosis. (R. at 1414, 1473, 2202, 2215.) During this

time, Cox underwent pan-retinal photocoagulation, ("PRP"), treatment and retinal injections. (R. at 1409, 1472-74, 2190, 2192-93, 2206-09.) Cox's visual acuity ranged from 20/20 to 20/100 in the right eye and 20/20 to 20/80 in the left eye. (R. at 1400, 1403, 1406, 1408, 1411, 1444, 2179, 2200, 2210, 2213, 2217, 2255, 2258, 2288, 2679.) In June 2014, examination showed a small amount of hemorrhage, moderate proliferative diabetic retinopathy of the right eye and bilateral cataracts, which were not affecting Cox's vision. (R. at 1445.) In October 2015, Cox stated he did not feel comfortable driving because his vision had worsened. (R. at 2213.) He also reported he had to enlarge the font on his computer to 300 percent to be able to read it. (R. at 2213.) Dr. Brandon Lee, M.D., an ophthalmologist with The Regional Eye Center, reported Cox's bilateral vitreous hemorrhage was resolving. (R. at 2215.) In September 2016, Cox reported occasional floaters in both eyes, but denied vision changes, pain, irritation and flashes. (R. at 2679.)

When Cox saw Mary Beth Bentley, F.N.P., a family nurse practitioner at The Health Wagon, on January 20, 2014, he did not report any symptoms, including depression or anxiety, and he was in no acute distress. (R. at 1508-09.) A physical examination was unremarkable, including a full range of motion of the neck, no extremity edema, normal motor strength and normal sensation; he was alert and oriented with intact cognitive function, good eye contact, good judgment and insight, clear speech, thought content free of suicidal ideation or delusions and logical and goal-directed thought processes. (R. at 1508.) A physical examination on February 3, 2014, yielded the same results. (R. at 1506.) On February 25, 2014, Cox had trace edema to the legs, but he reported that he had run out of insulin. (R. at 1504.) The rest of the physical examination was unremarkable, and a mental status examination also was normal, including intact cognitive function, good judgment and insight, full range mood and affect, no hallucinations, no suicidal

ideation or delusions and logical and goal-directed thought processes. (R. at 1504.) Over this time, Cox was diagnosed with diabetes; unspecified essential hypertension; nonspecific abnormal liver function study results; mixed hyperlipidemia; and hypothyroidism. (R. at 1504-06, 1508.) He was continued on medications and advised to lose weight. (R. at 1505-06, 1508-09.)

On April 17, 2014, Paula Hill Meade, F.N.P., a family nurse practitioner with The Health Wagon, completed a letter on behalf of the Wise County Department of Social Services, finding that Cox was permanently disabled due to diabetes mellitus with nephropathy, hypertension and hypothyroidism. (R. at 1398.) Cox continued to see Meade in April and May 2014, during which time he had normal physical examinations, with the exception of trace edema to the legs. (R. at 1495, 1497.) Mental status examinations were unremarkable. (R. at 1495, 1497.) On April 22, 2014, a foot examination also was normal. (R. at 1497.)

On May 25, 2014, Meade completed a physical assessment, finding Cox could lift and/or carry items weighing up to 10 pounds occasionally and up to five pounds frequently; he could stand and/or walk for a total of 30 minutes in an eight-hour workday, but could do so for only 15 minutes without interruption; he could sit for a total of 30 minutes in an eight-hour workday, but could do so for only 15 minutes without interruption; and he could never climb, stoop, kneel, balance, crouch or crawl. (R. at 1456-58.) Meade found Cox's abilities to reach, to handle, to feel, to push/pull, to see and to speak were affected by his impairments due to his diabetic retinopathy and a visual disturbance of the left eye due to hemorrhage. (R. at 1457.) She found Cox could not work around moving machinery, temperature extremes, chemicals, dust, fumes and humidity. (R. at 1458.) Meade opined Cox would miss more than two workdays monthly. (R. at 1458.)

On May 28, 2014, Cox saw Meade and reported continued spots before his eyes and floaters and a history of diabetic neuropathy with increased pain and burning in the lower extremities. (R. at 1492.) On examination, Cox was alert and in no distress; he had a normal gait and normal extremity motor strength; there was no clubbing or cyanosis of the extremities, but trace edema to the legs, and peripheral pulses were normal throughout; he was alert and oriented with intact cognitive function; he made good eye contact; he had good judgment and insight; he had clear speech; and he had logical and goal-directed thought processes. (R. at 1492.) In addition to his previous diagnoses, Cox was diagnosed with diabetes with neurological manifestations, and he was advised on foot care. (R. at 1492-93.)

On June 24, 2014, Cox saw Bentley and reported his blood sugar and blood pressure had been well controlled. (R. at 1488.) At that time, he complained of low back pain at times, as well as tingling and numbness, but he denied all other symptoms, including anxiety, depressed mood and suicidal thoughts. (R. at 1488.) Physical examination, as well as mental status examination, were completely unremarkable. (R. at 1487.) Cox was seen at The Health Wagon on three occasions during the remainder of 2014. During this time, Cox reported his diabetes was well controlled, and he denied blurred vision, diminished visual acuity and flashes of light and floaters in his visual field. (R. at 2133, 2145.) In December 2014, Cox complained of tingling and numbness in his lower extremities and chronic low back pain. (R. at 2133.) His examination was normal except his peripheral pulses were 2+, and he had decreased sensation in both feet. (R. at 2132.) Cox continued treatment at The Health Wagon throughout 2015, and treatment notes indicate Cox's examinations were normal. (R. at 2123-24, 2126-31, 2148-49, 2152, 2165.) In January 2015, Cox complained of depression and requested medication. (R. at

2131.) In February 2015, Cox was diagnosed with anxiety, but, by October 2015, he reported his anxiety was controlled. (R. at 2126, 2154.)

Beginning in November 2015 through July 2018, Cox treated with Dr. Brian Newberry, D.O., a physician with Community Physicians – Norton, for various problems, including chest pain, fatigue, persistent cough, diabetes mellitus, obstructive sleep apnea, depression and joint pain. During this time, Cox's fatigue mildly improved with Synthroid; his chronic joint pains were doing fairly well overall and were generally controlled with medications; his depression improved with medication; his obstructive sleep apnea was doing well with CPAP treatment;[10] his liver function tests were within normal limits; he was fairly compliant with treatment of his diabetes mellitus and had good tolerance of treatment rendering his symptoms fairly controlled; and his hypertension was stable. (R. at 2453-54, 2469-70, 2490-91, 2497-98, 2505-06, 2725-26, 2734-35, 2749-50, 2757-58, 2765-66, 2777-78, 2931-32, 2941-42.) Cox's examinations were normal, except he had mild venous stasis changes in the bilateral lower shins; mild small popular rash of the bilateral lower extremities with excoriations; and he had 1+ to 2+ edema in the lower extremities. (R. at 2457, 2464, 2472-73, 2478-79, 2493, 2500, 2508, 2523, 2529-30, 2537, 2729, 2738, 2753, 2761, 2769, 2781, 2935, 2945, 3017.) In July 2016, Dr. Matthew Beasey, M.D., noted Cox's renal disease was stable. (R. at 2465.)

Based on Cox's complaints of nonexertional chest pain, a nuclear stress test was performed in July 2016, which showed no evidence of myocardial ischemia. (R. at 2564.) Chest x-rays showed degenerative changes in the thoracic spine;

---

[10] On May 5, 2016, a sleep study showed very severe obstructive sleep apnea hypopnea syndrome; hypertension; morbid obesity; diabetes mellitus; and nocturnal hypoxemia. (R. at 2543-59.)

Cox's heart was described as upper limits to slightly enlarged; he had some mild prominence of the central mediastinum, particularly along the right; and he had mild pleural thickening along the periphery of the upper hemithorax on the right and left side. (R. at 2566.) In August 2016, a chest x-ray showed no significant abnormalities. (R. at 2561.) In September 2016, Dr. Newberry reported Cox was doing well overall with his regimen and recommended Cox diet and exercise. (R. at 2782.)

On September 21, 2016, Dr. Jameson Buston, M.D., a state agency physician, completed a medical assessment, finding Cox had the residual functional capacity to perform light work, except he could stand and/or walk four hours in an eight-hour workday and sit up to six hours in an eight-hour workday; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds; and he could have no concentrated exposure to temperature extremes, vibration and hazards, such as machinery and heights. (R. at 1842-44.) No manipulative, visual or communicative limitations were noted. (R. at 1843.)

On November 22, 2016, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding Cox had the residual functional capacity to perform light work, except he could stand, walk and/or sit six hours in an eight-hour workday; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds; and he could have no concentrated exposure to temperature extremes, vibration and hazards, such as machinery and heights. (R. at 1875-77.) No manipulative, visual or communicative limitations were noted. (R. at 1876.)

On January 23, 2017, an ultrasound of Cox's abdomen showed his liver to be minimally enlarged with echotexture suggestive of fatty infiltration. (R. at 2793.) Cox was followed by Dr. William Hood, M.D., a physician at Mountain States Medical Group – Gastroenterology, for fatty liver disease. (R. at 2710-14.) On June 14, 2017, a HIDA scan was normal with a gallbladder ejection fraction of 77 percent. (R. at 2723.) On June 23, 2017, an esophagogastroduodenoscopy, ("EGD"), was performed, and biopsies showed abnormal periampullary tissue, hiatal hernia and small bowel mucosa with mild acute inflammation. (R. at 2719-22.) On November 30, 2017, x-rays of Cox's chest showed no active cardiopulmonary disease. (R. at 2797.)

On January 1, 2018, Cox presented to the emergency department at Lonesome Pine Hospital for complaints of toe pain, cough and headache. (R. at 2687-92.) He reported he injured his left large toe after becoming "stressed" and kicking a gate. (R. at 2687.) Examination was normal, except for bruising of the left large toe. (R. at 2689.) X-rays of Cox's left toe were normal. (R. at 2691-92.) He was diagnosed with contusion of the left great toe with damage to nail; subungual hematoma of toe of the left foot; and viral upper respiratory tract infection. (R. at 2690.)

On January 29, 2018, an ultrasound of Cox's abdomen showed mild hepatomegaly with fatty infiltration. (R. at 2788.) On June 28, 2018, a CT scan of Cox's head was normal. (R. at 2946, 2994.)

On June 12, 2018, Jennifer Taylor, N.P., a nurse practitioner with Johnston Memorial Diabetes and Endocrinology Center,[11] completed a medical assessment, finding Cox could lift and/or carry items weighing up to five pounds occasionally; he could stand and/or walk for a total of less than four hours in an eight-hour workday, but could do so for less than one hour without interruption; he could sit for a total of less than four hours in an eight-hour workday, but could do so for less than one hour without interruption; he could occasionally kneel, crouch and crawl, but never climb, stoop and balance; his abilities to reach, to handle, to feel, to push/pull and to see were affected by his impairments; and he was restricted from working around heights; moving machinery; temperature extremes; chemicals; dust; fumes; humidity; and vibration. (R. at 2817-19.) Taylor opined Cox would miss more than two workdays monthly. (R. at 2819.)

As for his mental health treatment, in January 2012, Cox began counseling with Anne Jacobe, L.C.S.W., a licensed clinical social worker, for complaints of moderate depression, anxiety, irritability, anger, panic attacks and decreased attention and concentration. (R. at 966, 968-73, 975-78, 1007, 1054, 1057.) During this time, Jacobe found Cox had a depressed and irritable mood with an anxious affect, but intact orientation and thought process,[12] no paranoia/delusions and fair insight and judgment. (R. at 964, 966-78, 1007-08, 1054-57.) Jacobe diagnosed Cox with moderate, recurrent major depressive disorder and agoraphobia with panic attacks. (R. at 978.) In addition to work-related stress, Cox routinely reported

---

[11] From October 2015 through June 2018 Cox treated at Johnston Memorial Diabetes and Endocrinology Center for care of his type 1 diabetes mellitus. During this time, Cox's examinations showed 2+ edema in his lower extremities; he had a normal gait; both feet showed vibratory perception of the great toe; and his mood and affect were appropriate. (R. at 2318-19, 2333, 2339-40, 2345, 2827-28, 2836, 2844, 2852, 2860-61, 2869, 2876-77, 2887, 2895.)

[12] On five occasions, his thought process was described as racing. (R. at 968-69, 972, 977, 1056.)

additional stressors, which included his mother's hospitalization, transportation difficulties, increased physical pain, difficulty obtaining his medications, family conflict and losing his home. (R. at 970-71, 973, 975, 1007, 1054, 1055-58.)

On July 12, 2012, Jacobe completed a mental assessment, finding Cox had a satisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment with the public; to interact with supervisors; and to understand, remember and carry out simple job instructions. (R. at 959-61.) She further found Cox had a seriously limited ability to deal with work stresses; to function independently; to understand, remember and carry out detailed job instructions; to maintain personal appearance; and to demonstrate reliability. (R. at 959-60.) Jacobe found Cox had a poor or no ability to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 959-60.) She found his ability to maintain attention and concentration depended on his blood sugar levels. (R. at 959.) Jacobe supported these findings by stating Cox's anxiety/social phobia impacted his ability to deal with new situations and new people, and his health issues impacted all areas. (R. at 959.) In particular, she noted his diabetes, anxiety, depression and self-worth issues impacted his focus and concentration, and his blood sugar levels affected his mood. (R. at 960-61.) Jacobe concluded Cox would be absent more than two workdays monthly due to his impairments or treatment. (R. at 961.)

On December 6, 2012, Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"),[13] finding that, despite

---

[13] On June 14, 2013, Howard S. Leizer, Ph.D., a state agency psychologist, ("H. Leizer"), completed a PRTF which mirrored that of Dr. Bockner's from December 6, 2012. (R. at 110-11.)

a diagnosis of depression, Cox was capable of all ranges of work and that any mental symptoms could not be purely attributed to a mental diagnosis. (R. at 85-86.) Thus, Dr. Bockner concluded Cox did not have a medically determinable mental impairment at that time. (R. at 86.)

On February 17, 2014, Cox began seeing Karen Odle, a licensed professional counselor at Clinch River Health Services, Inc. (R. at 1452-54.) His presenting problems were depression and social anxiety, but he reported no prior hospitalizations. (R. at 1452, 1454.) On mental status examination, Cox was cooperative with normal motor activity, appropriate affect with depressed mood, he had normal speech and thought processes with no abnormalities of thought content, he had no suicidal or homicidal ideations, he was fully oriented, and his remote memory was impaired, but his cognitive function, abstraction, judgment and insight were intact. (R. at 1453.) Odle continued to see Cox throughout 2014, during which time he reported mild to moderate depression, mild anxiety, mild to moderate insomnia and hyperinsomnia, mildly decreased appetite, mild to moderately decreased energy, mild irritability/anger and no suicidal or homicidal ideations. (R. at 1450-51, 1464, 1673, 2590-92.) Mental examinations showed Cox had a depressed mood with a euthymic and subdued affect, intact orientation and thought process, no paranoia/delusions and good judgment and insight.[14] (R. at 1450-51, 1464, 1673, 2590-92.) Cox reported his family environment was causing increased stress, but he was doing "ok" mentally. (R. at 1450, 1464, 1673.) He also reported he transported a friend to medical appointments and other activities and going out with a friend to work on computers. (R. at 1450, 1464.)

---

[14] Once, Cox's affect was described as anxious, and on two occasions, Cox's insight and judgment were deemed fair. (R. at 2590, 2592.)

On February 25, 2014, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Cox at the request of Cox's attorney. (R. at 1062-69.) Cox reported working puzzles, watching television, spending some time on the internet and reading. (R. at 1063.) He reported rarely leaving home. (R. at 1063.) On mental status examination, Cox's affect was generally flat and blunt, but he was fidgety and somewhat jumpy; he made good eye contact; rapport was reasonably well established; his mood was described as a combination of anxiety and depression; he was able to recall four of five words; and he correctly performed Serial 7 testing. (R. at 1063.) Cox displayed no clinical signs of a thought disorder, ongoing psychotic processes, delusional thinking or hallucinations of any type. (R. at 1064.) Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), and Cox achieved a full-scale IQ score of 92, placing him in the borderline range of intellectual functioning. (R. at 1064-65.) Lanthorn noted Cox showed the signs of social anxiety disorder. (R. at 1068.) He further noted Cox had a distinct flattened affect and a sort of detachment and aloofness about him, leading to a diagnosis of schizoid personality disorder. (R. at 1068.) While Cox had depressive symptomotology, Lanthorn opined it did not rise to the level of a diagnosis. (R. at 1068, 1395.)

On March 5, 2014, Lanthorn completed a mental assessment, finding Cox had a more than satisfactory ability to understand, remember and carry out simple and detailed job instructions; a limited, but satisfactory, ability to understand, remember and carry out complex job instructions; a seriously limited ability to follow work rules; to deal with work stresses; to function independently; to maintain attention and concentration; to maintain personal appearance; to behave in an emotionally stable manner; and to demonstrate reliability; and a poor or no ability to relate to co-workers; to deal with the public; to use judgment with the

public; to interact with supervisors; and to relate predictably in social situations. (R. at 1059-61.) Lanthorn supported these findings with Cox's diagnoses of social anxiety disorder and schizoid personality disorder. (R. at 1059.) He opined Cox would be absent from work more than two days monthly. (R. at 1061.)

On July 2, 2014, Odle completed a mental assessment, finding Cox had no limitations on his abilities to follow work rules; to function independently; and to understand, remember and carry out simple job instructions. (R. at 1460-62.) She found he was mildly limited in his abilities to maintain attention and concentration; to understand, remember and carry out detailed job instructions; and to maintain personal appearance. (R. at 1460-61.) Odle found Cox was moderately limited in his abilities to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1460-61.) Odle also found Cox was markedly limited in his abilities to deal with work stresses; and to demonstrate reliability. (R. at 1460-61.) She opined he would be absent from work more than two days monthly. (R. at 1462.) Odle did not specify any medical or clinical findings to support these findings.

On August 21, 2014, Bentley completed a mental assessment, finding Cox had a satisfactory ability to understand, remember and carry out simple job instructions; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 1478-80.) She opined Cox had a seriously limited ability to follow work rules; to relate to co-workers; to use judgment with the public; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out both detailed and complex

job instructions; and to demonstrate reliability. (R. at 1478-79.) She found Cox had a seriously limited to no ability to relate predictably in social situations; and no ability to deal with work stresses due to poor coping abilities and a poor ability to deal with the public. (R. at 1478-79.) She found Cox would miss more than two workdays monthly. (R. at 1480.) Bentley based these findings on Cox's allegations of having a poor rapport with co-workers, social anxiety, prior increased hostility and antisocial behavior in social situations. (R. at 1478-79.) She further noted Cox's various health issues compromised his ability to work and participate in social activities. (R. at 1480.) On this same day, Bentley opined Cox's condition met or equaled § 6.02(C)(2) of the Listing of Medical Impairments for impaired renal functioning. (R. at 1482.)

Throughout 2015, 2016 and 2017, Cox continued counseling with Odle for complaints of mild to moderate depression, mild anxiety, mild to severe difficulty sleeping, moderate social anxiety, mild to moderate irritability and anger, mild crying spells, mildly to moderately decreased attention and concentration and no suicidal or homicidal ideations. (R. at 2593-2609, 2802-11.) Odle routinely found Cox's mood was depressed with a euthymic or subdued affect, he had intact orientation and thought process, no paranoia/delusions and good judgment and insight.[15] (R. at 2593-2609.)

On September 19, 2016, H. Leizer completed a PRTF, finding Cox suffered from severe affective, anxiety and personality disorders. (R. at 1839-40.) He opined Cox had moderate limitations on his activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or

---

[15] On September 10, 2015, Odle found Cox's judgment and insight were fair. (R. at 2599.)

pace, and he had experienced no repeated episodes of extended-duration decomposition. (R. at 1840.)

That same day, H. Leizer also completed a mental assessment, indicating Cox had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 1844-46.) H. Leizer stated Cox's work-related mental abilities were, otherwise, not significantly limited. (R. at 1884-46.) H. Leizer opined that Cox was capable of performing simple, unskilled work. (R. at 1846.)

On November 22, 2016, Joseph Leizer, Ph.D., a state agency psychologist, ("J. Leizer"), completed a PRTF, finding Cox suffered from severe affective, anxiety and personality disorders. (R. at 1873-74.) He opined Cox had moderate limitations on his activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace, and he had experienced no repeated episodes of extended-duration decomposition. (R. at 1873.)

That same day, J. Leizer also completed a mental assessment, indicating Cox had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by

them; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 1877-79.) J. Leizer stated Cox's work-related mental abilities were, otherwise, not significantly limited. (R. at 1877-79.) J. Leizer opined that Cox was capable of performing simple, unskilled work. (R. at 1879.)

In 2018, Cox continued counseling with Odle for complaints of mild to moderate depression, mild to moderate anxiety, mild to moderate difficulty sleeping, moderate social anxiety, mild irritability and anger and no suicidal or homicidal ideations. (R. at 2799-2801, 2820-21.) Odle found that Cox's mood was depressed with a euthymic or subdued affect, he had intact orientation and thought process, no paranoia/delusions and good judgment and insight. (R. at 2799-2801, 2820-21.)

On May 15, 2018, Odle completed a mental assessment, finding Cox had no limitation on his ability to understand, remember and carry out simple job instructions and, at most, a slight limitation on his ability to understand, remember and carry out detailed instructions. (R. at 2813-15.) She opined Cox had slight limitations in his ability to follow work rules; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to maintain personal appearance; and to demonstrate reliability. (R. at 2813-14.) Odle found Cox had a satisfactory ability to use judgment in public; to interact with supervisors; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 2813-14.) She found Cox was seriously limited in his ability to relate to co-workers and to deal with the public. (R. at 2813.) Odle opined Cox had no useful ability to deal with work

stresses. (R. at 2813.) She found Cox would miss more than two workdays monthly. (R. at 2815.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As noted above, Cox's claims were remanded by this court for further consideration of his renal function impairment and the effect such impairment would have on his work-related abilities. (R. at 1824-26.) On remand, the ALJ analyzed Cox's impairments of renal function and found his impairments did not meet or equal § 6.00C1, the listing for chronic hemodialysis or peritoneal dialysis, or § 6.00C3, the listing for renal osteodystrophy. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 6.00C1 and 6.00C3 (2020).[16] While the ALJ did not specifically identify § 6.05, the listing for chronic kidney disease, in her opinion, she discussed the requirements necessary to meet this listing. (R. at 1693.) Listing § 6.05 requires the following:

*Chronic kidney disease*, with impairment of kidney function, with A and B:

A. Reduced glomerular filtration evidenced by one of the following laboratory findings documented on at least two occasions at least 90 days apart during a consecutive 12-month period:

1. Serum creatinine of 4 mg per deciliter (dL) or greater; or
2. Creatinine clearance of 20 ml per minute or less; or
3. Estimated glomerular filtration rate of 20 ml per minute/$1.73m^2$ or less.

AND

B. One of the following:
1. Renal osteodystrophy with severe bone pain and imaging studies documenting bone abnormalities, such as osteitis fibrosa, osteomalacia, or pathologic fractures; or
2. Peripheral neuropathy; or
3. Fluid overload syndrome documented by of the following:
   a. Diastolic hypertension greater than or equal to diastolic blood pressure of 110 mm Hg despite at least 90

---

[16] While the ALJ referenced §§ 6.00E1 and 6.00E3, this is a typographical error. (R. at 1693.) The ALJ's reference to chronic hemodialysis or peritoneal dialysis and renal osteodystrophy indicates she intended to reference §§ 6.00C1 and 6.00C3.

consecutive days of prescribed therapy, documented by at least two measurements of diastolic blood pressure at least 90 days apart during a consecutive 12-month period; or

b. Signs of vascular congestion or anasarca despite at least 90 consecutive days of prescribed therapy, documented on at least two occasions at least 90 days apart during a consecutive 12-month period; or

4. Anorexia with weight loss ….

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.05 (2020).

For a claimant to demonstrate his impairments meet or equal a listed impairment, he must prove he "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). There is no evidence in the record to show Cox is undergoing dialysis, but there is evidence to show Cox suffers from chronic renal disease and diabetic nephropathy. (R. at 820, 831, 877, 1398.) However, the record shows Cox's impairment does not meet the remaining requirements, as mandated by *Sullivan*. Cox's serum creatinine levels ranged from 1.0 mg/dL to 1.38 mg/dL, and his estimated glomerular filtration, ("eGFR"), rate routinely ranged from 63 ml per minute to 90 ml per minute. (R. at 820, 824, 831, 877, 1547, 1643, 1646, 2171, 2393, 2525-26, 2533-34, 2541-42, 2830-31, 2838-39, 2846-47, 2855-56, 2863-64, 2871-72, 2878-79, 2890-91, 2903, 2906, 2917, 2939-40, 2948-49, 2972, 3000, 3020-21.) Examinations showed Cox had a normal gait; normal strength and muscle tone; no clubbing or cyanosis and only occasional trace edema in the bilateral lower extremities; he had mild venous stasis changes in the bilateral lower shins and mild small popular rash of the bilateral lower extremities with excoriations; and 2+

peripheral pulses.[17] (R. at 754, 819, 830, 870, 882, 886, 1492, 1495, 1497, 1506, 1508, 1515, 1520, 1522, 1525-26, 1534, 1541, 1544, 2123, 2126, 2130, 2132, 2148, 2152, 2318-19, 2333, 2339-40, 2345, 2457, 2464, 2472-73, 2478-79, 2493, 2500, 2508, 2523, 2530, 2537, 2729, 2738, 2753, 2761, 2769, 2781, 2827, 2836, 2844, 2852, 2860-61, 2869, 2876, 2887, 2895.) Cox was "fairly compliant" with treatment of his diabetes mellitus and had good tolerance of treatment, rendering his symptoms "fairly controlled," and his hypertension was stable. (R. at 1488, 2133, 2144, 2453-54, 2469-70, 2490-91, 2497-98, 2505-06, 2725-26, 2734-35, 2749-50, 2757-58, 2765-66, 2777-78, 2931-32, 2935, 2941-42, 2945, 3017.) In July 2016, Dr. Beasey reported Cox's renal disease was stable. (R. at 2465.) In addition, medical expert, Dr. Owens, opined Cox's kidney problems would have "very little if any real symptoms," and, thus, would not be disabling. (R. at 1755.) Based on this, I find substantial evidence exists to support the ALJ's finding that Cox did not meet or equal the listed impairment for chronic kidney disease.

Cox argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Jacobe, Meade, Bentley, Odle, Taylor and Lanthorn. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-9.)

The ALJ found Cox had the residual functional capacity to perform a limited range of simple, repetitive, unskilled sedentary work. (R. at 1696-97.) In addition, the ALJ found Cox was able to attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but could complete a normal eight-hour workday and 40-hour workweek; he could have occasional interaction with the general public, co-workers and supervisors; and he could

---

[17] In December 2014, Cox had decreased sensation in both feet. (R. at 2132.)

respond appropriately to supervision, co-workers and usual work situations. (R. at 1697.)

In making this residual functional capacity finding, the ALJ gave "little weight" to the opinions of Jacobe, Bentley and Lanthorn. (R. at 1712.) The ALJ noted Jacobe referenced the impact of Cox's diabetes on his mental health, on which she was not qualified to comment; she based part of her decision on Cox's self-report; and her treatment notes generally only documented subjective complaints. (R. at 959-61, 1712.) The ALJ found Bentley's opinion was based on Cox's reports, and she referenced multiple physical issues when discussing Cox's mental health limitations. (R. at 1478-80, 1712.) The ALJ noted that, while Lanthorn performed a thorough examination of Cox, his opinion was inconsistent with the "fairly benign examination" and Cox's own reports. (R. at 1059-61, 1712.) For example, the ALJ noted Cox denied issues with concentration, and examination was "unrevealing," yet Lanthorn indicated Cox had no useful ability to maintain attention and concentration. (R. at 1059, 1063-64, 1712.)

The ALJ gave "some weight" to the 2016 opinions of the state agency psychologists, both of whom found Cox had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 1711, 1844-46, 1877-79.) The ALJ gave "great weight" to the opinion of Dr. Owens because he had the opportunity to examine Cox's entire file. (R. at 1712.) Dr. Owens testified there was no consistency concerning Cox's mental diagnosis

or in his mental residual functional capacity; therefore, he did not find Cox met or equaled any of the listings of impairments for psychiatric impairments. (R. at 1755-56.) However, based on Cox's mental impairments, he found Cox would be limited in his ability to interact with "a lot of people." (R. at 1756.) Furthermore, in 2018, Odle opined Cox had a satisfactory ability to use judgment in public, to interact with supervisors, to behave in an emotionally stable manner and to relate predictably in social situations; a seriously limited ability to relate to co-workers and to deal with the public; and no useful ability to deal with work stresses. (R. at 2813-14.)

In February 2014, Cox's examination with Lanthorn revealed he retained good eye contact despite appearing anxious, and he had intact thought processes. (R. at 1390-1391, 1703.) Cox's mental health examinations generally showed he was cooperative and pleasant; he had intact cognitive function; his insight and judgment were described as intact, fair and good; he was alert and oriented with good eye contact and clear speech; and he had logical and goal-directed thought processes. (R. at 754, 830, 882, 886, 894, 964, 966-78, 1007-08, 1054-57, 1450-51, 1453, 1464, 1487, 1492, 1495, 1497, 1504, 1506, 1508, 1515, 1520, 1522, 1525, 1534, 1541, 1544, 1673, 2590-92, 2799-2801, 2820-21.) Although Cox complained of situational stressors from time to time, (R. at 1450, 1464, 1673), he reported he was doing "ok" mentally, and medication improved his symptoms of anxiety and depression. (R. at 1673, 2154, 2454, 2470, 2491, 2498, 2506, 2726, 2735, 2750, 2758, 2766, 2778, 2931, 2942.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, Cox reported he worked puzzles; watched television; spent time browsing the internet; transported a friend to medical appointments and other activities; and worked on computers with a friend.

-31-

(R. at 1063, 1450, 1464, 1739.) Based on this, I find substantial evidence exists to support the ALJ's finding concerning Cox's mental residual functional capacity.

I turn next to Cox's argument that the ALJ erred by rejecting the opinions of Meade, Bentley[18] and Taylor in determining his physical residual functional capacity. (Plaintiff's Brief at 9.) The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c) (2020); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2020) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of his own limitations. *See* 20 C.F.R. §§ 404.1545, 416.945.

The ALJ gave "some weight" to the opinions of the state agency physicians, but included additional limitations based on the expanded record and Cox's reports. (R. at 1712, 1842-44, 1875-77.) The ALJ gave "little weight" to the opinions of Meade and Taylor. (R. at 1398, 1456-58, 1712, 2817-19.) The ALJ gave little weight to Meade's opinion that Cox did not have the residual functional capacity to perform even sedentary work because her own treatment notes did not support such a finding. (R. at 1456-58, 1712.) Meade's office notes show that, other than trace edema in Cox's legs, physical examinations were normal,

---

[18] In August 2014, Bentley opined Cox's condition met or equaled § 6.02C(2). (R. at 1482.) Based on my findings above, however, I will not address Cox's argument that the ALJ erred by rejecting this opinion.

including a normal gait and motor strength. (R. at 1492, 1495, 1497.) X-rays of Cox's lumbar spine, performed in 2012, revealed mild spondylosis; mild compression deformity at the T12 vertebra; minimal discogenic abnormalities at the L3-L4 and T12-L1 levels; and mild wedging of the T11 vertebra. (R. at 890-91.) The record shows Cox reported his chronic joint pains[19] were stable and generally were controlled with medications. (R. at 1544, 2454, 2470, 2490-91, 2498, 2505, 2726, 2734, 2750, 2758, 2766, 2778, 2931.)

The ALJ noted Taylor's opinion was not supported by objective findings. (R. at 1712.) In October 2013, Cox reported his blood sugar readings ranged from the 120s to 150s, with no significant highs or lows, and he denied blurred vision and diminished visual acuity or floaters. (R. at 1516.) From December 2013 to March 2014, Cox's blood sugar readings were 183, 271, 253 and 510. (R. at 1502, 1504, 1506, 1513.) From April to June 2014, Cox's blood sugar readings were 262, 219, 123, 176 and 412, and he weighed 317 to 321 pounds. (R. at 1487, 1490, 1495, 1497.) By June 24, 2014, Cox reported his blood sugar had been well-controlled with no significantly high readings, and he reported well-controlled blood pressure. (R. at 1488.) Cox denied blurred vision, diminished visual acuity and flashes of light and floaters in his visual field. (R. at 1488, 2133, 2145.) During this time, Cox's physical examinations were unremarkable. (R. at 1495, 1497, 1506, 1508.)

Cox was treated at Johnston Memorial Diabetes and Endocrinology Center for his diabetes mellitus from August 2015 through July 2018. Although Cox's blood sugar readings ranged from 54 to 409 during this time period, (R. at 2171,

---

[19] When Cox complained of chronic joint pains, he related the pain to overuse. (R. at 2454, 2470, 2491, 2498, 2505, 2758, 2766, 2778.)

2393, 2396, 2459, 2846, 2863, 2871, 2878, 2903, 2906, 2917, 2948, 2972, 3000, 3020), his examinations generally revealed intact neurological findings; mild edema; normal foot examinations; normal gait; and normal strength and muscle tone. (R. at 2318, 2333, 2339, 2345, 2827-28, 2836, 2844, 2852, 2860-61, 2869, 2876-77, 2887, 2895.) While Cox had a small amount of hemorrhage, moderate proliferative diabetic retinopathy of the right eye and bilateral cataracts, Dr. Lee found Cox's vision was not affected, and, in fact, it was noted Cox's vision improved with treatment. (R. at 1412, 2215, 2679.)

The ALJ gave "great weight" to Dr. Owens's opinion because he had the opportunity to examine Cox's entire file. (R. at 1712.) Dr. Owens testified Cox's impairments did not meet or equal a listed impairment; thus, the ALJ found Cox could perform a limited range of sedentary work. (R. at 1696-97, 1753, 1755.) The ability to perform sedentary work involves sitting and a certain amount of walking and standing. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a). Furthermore, Social Security Ruling 83-10 indicates, although sedentary jobs are performed primarily in a seated position, walking and standing are required occasionally.[20] *See* Social Security Ruling, ("S.S.R."), 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 1992). As noted by the ALJ, the medical record does not show Cox exhibited multi-joint inflammation which caused him to have difficulty initiating movement, difficulty moving in general or muscle tremors. (R. at 1713.) While Cox complained of joint pain, he attributed it to overuse and reported his symptoms generally were controlled with medication. *See Gross,* 785 F.2d at 1166.

Based on this, I find substantial evidence exists to support the ALJ's weighing of the medical evidence and her finding as to Cox's residual functional

---

[20] Occasionally is defined as occurring from very little up to one-third of the time. *See* S.S.R. 83-10.

capacity. Thus, I find substantial evidence exists to support the ALJ's finding that Cox was not disabled.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2.   Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.   Substantial evidence exists in the record to support the Commissioner's finding that Cox was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Cox's motion for summary judgment and grant the Commissioner's motion for summary judgment.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo

determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      September 30, 2021.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE